Duncan, J.
concurred with the majority as to so-much of the judgment of the Court as decided that, judgment of acquittal in favour of the prisoners ought to t>e pronounced upon the verdict of the jury, upom -technical grounds, independent of the question of jurisdiction. And he is not to be understood as committed' to the reasoning of the Judges upon the question of jurisdiction.
Scott, J.
After the elaborate exposition of the subject under consideration which has been presented by the Judges who have preceded me, little more is left for *763 me than to say that I dissent from the judgment of the . . majority.
My opinion is, that the grant from Virginia to the • United States, of the territory northwest of the Ohio, ex vi termini reserved that river to Virginia. And I cannot divest myself of the notion that the geographical object which we call a river consists of flowing water, a bed for it to pass over, and banks to confine it; and as the river, the whole of it, belongs to Virginia, she owns every part of it, water, bed and banks to the extreme northwestern verge.
It is conceded by those who differ from me in my conclusions, that when Virginia made the cession, she owned the territory on both sides of the Ohio, and ihat she reserved the river to herself. So that the question is narrowed down to “ What is a river?” And I repeat that I can as readily conceive the idea of an animal without its essential parts, as of a river without banks. It must have banks in the lowest stage of the water. If this be so, then the question is reduced to a still narrower compass; to wit: What is the limit to its banks? Is that limit low water mark ? If so, then the Ohio river is out of its banks for nine months in the year!
The length of a river may be assumed as a constant quantity. Its depth and width, (depending on the quantity of rain which falls within the basin which it drains, and that being variable,) are variable quantities. Can it be said, without a solecism, that a variable quantity never exceeds its minimum? And if not, neither can it be said that the depth and width of a river are confined to low water mark.
The common law writers tell us that those rivers in which the tide ebbs and flows are called navigable rivers, and belong, both water and soil, to the Crown. This property of the Crown has limits. What is the limit to a navigable river on its margin ? High water mark. The space between that and low water mark is *764 called the shore. The shore belongs to the Crown, because the river belongs to the Crown, and the shore is part of the river. So say I of the Ohio river. It be-l°ugs to Virginia ; its marginal limit is high water; and that is the limit to the domain of Virginia.
It is said that the river means the permanent river, and it loses the character of permanence when we pass low water mark. If the term river means only that which is within low water mark, by what name shall we call that flowing water beyond that mark, passing over a bed and confined by banks, which we meet with for nine months in the year ?
Rivers not navigable belong, both soil and water, to individuals. The public have an easement in them, a right to navigate them with boats: they are therefore called public highways. The jus publicum is confined to the river. It does not extend to one foot of the land of the riparian owner. This is well settled. What, I ask, are the limits of this public highway ? Is the boatman a trespasser, who goes beyond low water mark?
Obstructions placed in such rivers are nuisances, and may be abated and prosecuted as such. Can the riparian proprietor place obstructions on the shores, so as to confine the navigation to the middle of the stream in stages of high water ? And if the word river means the permanent river, and it loses the character of permanence after passing low water mark, and if the highway does not go beyond the river, what is to prevent the riparian owner from making what use he pleases of the shores which are no part of the river ?
As to the argument from inconvenience, I answer, cujus est dare ejus est disponere. The country on both sides of the river, and the river itself, belonged to Virginia. She made a voluntary donation of the vast and rich domain on its northwestern side ; a country capable of sustaining a population more than five times as great 1 as -that which she retained ; a population which might, *765 in course of human events, become hostile to her: and she can hardly be accused of selfishness or undue precaution, when, balancing the conveniences and inconveniences to herself and the donees, she preferred her own safety and her own convenience to the convenience of those on whom she had so liberally bestowed her bounty.
A further, and, if well founded, a satisfactory answer to the argument from inconvenience, is furnished by the able and learned counsel who appeared for the State of Ohio. I give no opinion on that article in the compact between Virginia and Kentucky, which, it is argued, grants to the States possessing the opposite shores concurrent jurisdiction over the whole river. It presents a very important question, and one not without its difficulties. It is not involved in this case, and therefore I give no opinion upon it. But if the learned counsel be right in his definition of “jurisdiction;” if it is “the right of dominion, of sovereign command over a place, the right to make laws for it and carry them into execution,” and if “concurrent” means “joint and equal, existing together and operating on the same objects,” there is an end to all complaint on the score of inconvenience. If Ohio has “ sovereign command” over the whole river ; if she can “ make laws for it and enforce them,” what more can she ask?
The case of Handley's lessee v. Anthony, is relied on as an authority against the views which I have endeavoured to present. It is with unfeigned diffidence that I should venture to question any thing which has fallen from the eminent Judge who delivered the opinion of the Court in that case. No one has formed a higher estimate of his exalted qualities as a man, a patriot and a Judge than I entertain. But when I am required in my official character to declare my opinion, I cannot do otherwise than obey the dictates of my own judgment, nor can I ás a Virginia Judge surrender what in my deliberate opinion are the undoubted rights of Virginia, *766 and give up her citizens to the penal laws of another State for enforcing the laws of Virginia within her limits, in deference even to his high authority.
I feel no difficulty in concurring in the judgment given in the case of Handley's lessee v. Anthony. I should have no hesitation in deciding that a narrow gut or bayou, some twenty paces wide, in which the water of the river sometimes flows, separating from Indiana a large body of land, which has always been deemed and held to be a part of the ceded territory, is no part of the great river Ohio; that the earth which confines the water in its occasional flow through this narrow channel, can in no sense be called a bank or banks of the river Ohio. But, for the reasons already given, and others more fully expressed by some of my brethren, I cannot agree that that great river is confined within the narrow limits of low water.
It is to be remarked, also, that the learned judge who delivered the opinion in that case, shrunk from carrying out the position to which I object to all its consequences. The Court below had decided that nothing can be called an island but that which is surrounded by the waters of the river at all times ; a definition which results, as it seems to me, from the position that the river is confined to low water mark.
The Supreme Court refused to sanction this definition, and the difficulty was gotten over by saying that it was made by the Court below, with reference to the case before it: that is, as I understand it, as the water of the river only occasionally passed through the little gut of which I have spoken, the land which was thus only occasionally surrounded by the waters of the river, was properly held not to be an island. It is further to be remarked, that this and the argument from inconvenience, are quite as much relied on as grounds for the decision, as the definition of a river.
*767 With my views of the case, I cannot unite with those of my brethren who give to Virginia and Ohio divisum imperium over the northwestern shore, giving dominion to Ohio when the water recedes, and to Virginia when it advances. I can find no middle ground to stand upon. The river belongs to Virginia. She has nothing more than the river, and she has the whole river. If the shore is no part of it, the shore is not hers ; if it is a part of the river, it is hers, and not the property of another at any time or in any condition.
Lomax, J.
The main question which is raised in this case, is, whether the offence charged upon the prisoners was committed within the territory and jurisdiction of Virginia.
About five and twenty years before this prosecution, the Supreme Court of the United States, in the case of Handley's lessee v. Anthony, 5 Wheat. 374, (which involved the territorial and jurisdictional limits between Kentucky and Indiana, upon the river Ohio,) decided that the territorial boundary which separated those two States was the low water limit of the western shore of the river Ohio. That case also involved, in some degree, the consideration, as between those two States, of the rights of domain in the river Ohio; and it was also held by the Court, that Kentucky was entitled to the river as a part of her domain. The relation in which Virginia stands to the citizens of Ohio, in regard to boundaries of soil and jurisdiction, is identical with that in which Kentucky stands to Indiana. If the decision, which has been referred to, is received by this Court as an authority, it must go very far to decide the question which is involved in the present case. In the discussion at the bar of this Court, that decision has been severely animadverted upon, both by the counsel for the Commonwealth of Virginia, and the counsel who appears on behalf of the State of Ohio. That de *768 cisión has been satisfactory to neither, and both have laboured to bring the authority of that case into ques-
In delivering the judgment of the Court in Ha?idley's lessee v. Anthony, Chief Justice Marshall said, that the question, whether the lands in controversy lay within the State of Kentucky or of Indiana, depended chiefly on the land law of Virginia, and on the cession made by that State to the United States. It was there laid down by the Court, as the doctrine of the law of nations, that 11 when a great river is the boundary between two nations or States, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in that case, one State (Virginia) is the original proprietor, and grants the territory on one side only, it retains the river within its own domain, and the newly created State extends to the river only. The river, however, is its boundary.”
The position taken by the Supreme Court, that Virginia was the original proprietor granting the territory on one side of the river, is vehemently contested by the-counsel .for Ohio, who insists, that the title, that is of Virginia and the United States, to each side of the river, is coeval with the other; and consequently, ■that according to the doctrine of the law of nations, which was recognized by the Supreme Court, the territory and jurisdiction of Ohio extend to the middle of the stream. The counsel for the Commonwealth, adopting the position of the Supreme Court, that Virginia •was the original' proprietor of the river and the ceded territory,-contend, in the first place, that she has never been divested of her domain, except to the northwest of the river Ohio ; and that the entire bed of the river within its banks still continues parcel of the domain and jurisdiction of Virginia. But if the boundary between Ohio and Virginia, as thus designated by the north *769 western banks of the river, be departed from for any considerations of expediency or convenience, then they contend in the second place, at the least, her jurisdic- . . , , , - . . tion extends over the entire body of water constituting the river at any given time. If the ground contended for by the counsel of Ohio be sustained, then as the of-fence charged is found to have been committed on the northwestern side of the middle of the stream, the case is clearly beyond the jurisdiction of Virginia. If, on the other hand, the first ground contended for by the counsel for Virginia, that the entire bed of the river within the banks, is within the jurisdiction of Virginia, be sustained, then the offence, according to the facts found in the special verdict, was committed within the jurisdiction of Virginia. Or if the latter alternative, contended for on the part of Virginia, be sustained, that the jurisdiction of Virginia is coextensive with the waters constituting the river, then the question of jurisdiction over the offence charged arises, involving more doubt and difficulty than when it rests upon the middle of the stream, or the banks or extreme bed of the river.
In maintaining their respective grounds, the counsel have expatiated widely, in discussing historical matters, which form no part of the findings of the jury, as presented in the special verdict in this case. Extrinsic facts, resting merely in historical truth, not stated in the verdict, do not properly form any part of the case. It is perhaps to be regretted that the verdict has not been more specific in its findings. In attempting to analyze it for the purpose of distinctly ascertaining what facts have been found by the jury, much of the verdict would seem to be objectionable, in finding what at best appears more like evidence that may be supposed to conduce to the establishment of certain facts, than the finding of those facts themselves. The peculiarity of this case, however, may make it not improper, as it seems to *770 me, that the grave questions which have been raised in the discussion of the case, so far as they can arise out of the special verdict, in its broadest and most liberal intendment, should be met, without any evasion, upon technical rules of practice. As in the case of Handley’s lessee v. Anthony, the Court took into its consideration the land law of Virginia, and the deed of cession made by Virginia to the United States, as parts of the general law, which Courts are bound to notice, without being set forth by pleading or proofs in the record, so this Court are bound, in addition to the facts found by the special verdict, to take notice of all general laws of the State which have a bearing upon the consideration of the question which is raised by the special verdict.
It would be impossible by the most concise analysis to state the matters in the special verdict within the compass of any moderate bounds, so far as they bear upon the title of Virginia to the western parts of this State, and to the river Ohio, and the territories northwest of that river. We obtain, however, from the finding of the jury, the fact, that on the 1st day of March 1784, the delegates of Virginia in Congress, did, under the authority conferred upon them by an act passed by her Legislature in October 1783, “convey, transfer, assign and make over unto the United States in Congress assembled, for the benefit of the said States, Virginia inclusive, all right, title and claim, as well of soil as of jurisdiction, which the said Commonwealth hath to the territory or tract of country within the limits of the Virginia charter, situate, lying and being to the northwest of the river Ohio, to and for the uses and purposes, and on the conditions of the said recited act.” The Act of the Legislature of Virginia of October 1783, referred to in the deed of cession, and that deed conformed to the terms of cession which Congress by resolution of 13th September 1783, had specified, and bound the United *771 States to accept. And on the 1st of March 1784, cotemporaneously with the execution of the deed, Congress by resolution, accepted the act of cession so made by Virginia. It will be observed that the land ceded had no other terms of description than “ the territory or tract of country within the limits of the Virginia charter, situate, lying and being on the northwest of the river Ohio.” It is not necessary to draw forth from the doctrines of municipal law any of the technical principles of estoppel, to apply them to compacts and grants, as between nation and nation. But it does seem to be a rational, just and legal intendment, applicable to nations as well as individuals, that the acceptance by one sovereignty of a grant of territory made to it by another, without any other title being shewn or pretended, but that derivable from the grant as its source, more especially when the grant stipulates various conditions which it belongs only to the acknowledged proprietor of the territory granted effectually to impose, must be regarded as an admission of the title so granted. If the territory granted was not within the limits of the Virginia charter, then it would seem that the grant and the acceptance were utterly nugatory ; because no other territory or tract was granted by Virginia, but what she had title to under that description. The compliance of Congress by its subsequent acts, (as found by the jury,) with the conditions prescribed in the cession, is an additional acknowledgment on the part of the United, States, that the cession made by Virginia was the source of their title. The application of Congress to the State of Virginia, after the deed of cession had been executed, for her consent to a change of some of these conditions, which induced the act of Virginia,. (1 Rev. Code 41,) concerning the territory ceded by this Commonwealth to the United States, gives increased force to that acknowledgment. There is no finding in the verdict, that against this title of Virginia, there was *772 any adverse claim of title set up by any other party. It will be remembered, that the right of the Indian nations, according to the established law of nations, and the whole system of the Colonial land law, was estimated at nothing. See Johnson v. M’Intosh, 8 Wheat. R. 543. There is no adverse title to that of Virginia shewn, or which can be deduced from the documents found in the special verdict. The United States, in Congress, held no such adverse title ; because, the United States could, under the articles of confederation, as Virginia, in her remonstrance of the 14th December 1779, insisted, “ hold no territory, but in the right of some one individual State in the Union.” Maryland, whatever may have been her jealousy or dissatisfaction at the extensive claims of Virginia, within her chartered limits, did not pretend that she held such adverse title. Her discontent seems mainly to have arisen out of the circumstance, that there were no western territories to which she could assert any peculiar claim. Her remonstrances, however strong in her “ declaration” and “ instructions,” of December 15th, 1778, as to the injustice and the impolicy of the claims of Virginia, to her western territories, or the injury which, if insisted on, they would inflict upon the other confederated States, did not disprove the title of Virginia ; nor could the assertion of her Legislature, “ that the exclusive claim set up by some States to the whole western country, by extending their limits to the Mississippi or South Sea, was, in their judgment, without any solid foundation,” be regarded as any disproof of the chartered title of Virginia. Nor could that title be brought into controversy by the seeming denial of that Legislature, “ that any evidences of that right, (the right of Virginia to her western territories,) had been produced, or any arguments alleged in support, either of the evidence or the right, that they had heard of, deserving a serious refutation.” Nor could that title be brought in question by *773 the declaration of Maryland, that she would “ accede to the confederation, provided an article or articles should be added thereto, giving the power to the United States in Congress assembled, to ascertain and fix the western limits of the States, claiming to extend to the Mississippi or South Sea,” &c. Nor does the act of New York, referred to in the proceedings of Congress, assert any title in New York, in the western lands, which were claimed by Virginia as within her chartered limits ; or tend to shew that the claims of Virginia were unfounded. There is no title to them in New York, shewn or asserted in that act. If, as was said in the argument, she had title by purchase from the Six Nations, that is not set forth in her act referred to ,- nor is it found specially in the verdict: and if such was her title, it was utterly nugatory. Johnson v. M’Intosh, 8 Wheat. R. 543. There is, therefore, in the special verdict, no title found adverse to the Virginia charter : nor even any matter found, from which the mind can draw an inference of any claim, adverse to the claim of Virginia under that charter.
It is clear that the Supreme Court of the United States, in the case of Handley’s lessee v. Anthony, regarded the cession by Virginia to the United States, as the unquestioned source of the title which the latter acquired in the lands northwest of the river Ohio : and moreover, regarded those lands as being within the charter of Virginia : and that Court placed the question to be decided in that case, as has before been stated, upon the land law of Virginia and the deed of cession executed by Virginia to the United States. Every Coirrt sitting in Virginia, to decide a question of Virginia law, in whatever form that question is raised, is bound to take notice of all the public acts and statutes of the Commonwealth, which may have any application to the case. The charter of 1609 was the commencement of the colonial or political existence of Vir *774 ginia ; and it was that charter which separated and designaled the country called Virginia, and the cominiinity which was settled upon it. That charter became the primal and perpetual law of this Commonwealth. The Crown of England, when by the judgment of quo warranto against the company in London, it took the charter out of their hands, did not cancel the charter. The government of the Colony, when it thereby became a Royal Colony, was still administered according to the scheme of government established by the previous charters. The rights guaranteed to the people of Virginia by that charter, were frequently and strenuously appealed to, down to the time of the revolutionary contest, as the chartered rights of Virginians. In March 1651, the treaty between Virginia and the Commonwealth of England, stipulated that “ Virginia should have, and enjoy the ancient bounds and limits granted by the charters of the former Kings.” This was a recognition in the most solemn form, notwithstanding the judgment above referred to in 1624, of the boundaries of Virginia and of her ancient charters. The subsequent grants by the King to Penn, Baltimore and Carteret, could not disturb those limits, but to the extent that those grants conveyed ; and even to that extent were remonstrated against by the Colony. Except to the extent of these encroachments, nothing has been found, either in the verdict of the jury or in any public acts of the Colonial government, or of the State of Virginia, until the cession made in 1783, to abridge the limits claimed by her under her charter.
There are many public acts of the Colonial government of Virginia, in which her title was asserted, and dominion exercised by her over the territories she claimed, as her western territories, extending to the river Ohio, and beyond it, including the present State of Ohio; nor was any question ever raised as to that title or dominion by any civilized people, except for a *775 time by the French. These acts shew that she had extended her jurisdiction over the northwestern territory which was ceded, and that she had made grants of lands and settlements on the Ohio. In all these acts the consent of the King, the proprietor of the Colony, must necessarily have been given by himself or those who were authorized by him to give it. For in all the laws and public acts of the Colony, the approbation of the Sovereign, or of a substitute, fully representing him as to that matter, was indispensable. See 1 Rev. Code, page 38, in note; 2 Hen. St. 512, and note ; Ib. 527, 536 ; 1 Hen. St. 112; 1 Ramsay’s Hist. 258.
In 1734, (4 Hen. St. 450,) an act for dividing the county of Spottsylvania, erected the county of Orange, “ bounded westerly by the utmost limits of Virginia.”
In 1738, (5 Hen. St. 79,) the county of Augusta was taken from the county of Orange, extending in the same manner to the utmost limits of Virginia.
In 1769, (8 Hen. St. 395,) the county of Augusta was divided, and the county of Botetourt erected; both extending westerly to the utmost limits of Virginia. In the 9th section of that act it is recited, that the “ people situated on the waters of the Mississippi, in the said county of Botetourt, were very remote from their courthouse,” <fcc.
In 1772, (8 Hen. St. 600,) Fincastle county was taken from Botetourt; and the county of Fincastle must have extended to the Ohio, at least: for in 1776, (9 Hen. St. 257-8.) Fincastle lost its name in a division of it into the counties of Washington, Montgomery and Kentucky ; the last of which constitutes the territorial limits of the present State of Kentucky.
All the counties bordering on the Virginia side of the river Ohio, as well as Kentucky, may be traced in the subsequent legislation of the State, as parcels of the counties of Augusta and Botetourt, and consequently as parts originally of Orange, erected as far back as 1734.
*776 It appears from the laws of the Commonwealth, that prior to the year 1779, there were no lands granted on the northwest side of the river Ohio. But the grants of lands on the southeast side during the Colonial government, were numerous; and it appears from the laws of this Commonwealth, that settlements upon these grants adjacent to the river Ohio had been made. Titles to waste and unappropriated lands in the Colony, we know, were obtained by making an entry with the surveyor of a county in pursuance of law; or by an order of the Governor in Council, who was the deputy of the King ; or by an immediate grant from the Crown; and they were sometimes derived under proclamations of the Crown or the Governor. I will not speak of the grant which was made about the year 1749, by the King, to the Ohio company of 600,000 acres of land on the Ohio: and which Judge Marshall (1 vol. Life of Wash. 387,) says was granted as a part of the territory of Virginia. I have not access to any authentic sources of information in respect to the character or history of that grant; and if there be any recognition of it in any of the laws of the Commonwealth, it has escaped my search.
In 1754, Governor Dinwiddie, having determined immediately to build a fort on the river Ohio at the fork of Monongalia (then supposed to be within the territories of Virginia, and held as such), in order to oppose the French and Indians, and for the security of the Colony, issued his proclamation, promising that “ 200,000 acres of His Majesty the King of Great Britain’s lands, on the east side of the river Ohio within this dominion (100,000 acres whereof to be contiguous to the said fort, and the other 100,000 acres to be on or near the river Ohio) shall be laid oif and granted to such persons, who by their voluntary engagement and good behaviour in the said service, shall deserve the same.” 7 Hen. St. 661. The title to lands, under this and other proclamations, is recognized in the general land law passed in 1779; (see *777 2 Rev. Code 355, 348, 349;) and of course has relation back to the time of the proclamation. As early as 1752, (6 Hen. St. 258,) an Act of Assembly was passed for . , encouraging persons to settle on the waters or the Mississippi, (meaning doubtless the waters of the Ohio.) which the act described to be in the county of Augusta. An act, almost precisely the same, was again enacted in 1753. G Hen. St. 355. Again, in 1754, an act was passed for the encouragement and protection of the settlers upon the waters of the Mississippi, in which it was recited that “ many of His Majesty’s faithful subjects have been encouraged by the Acts of the General Assembly heretofore made, to settle and inhabit on his said lands in this Colony, in and near the waters of the river Mississippi, and it hath been represented to this present General Assembly, that the subjects of the French King, and by their instigation, the Indians in alliance with them have encroached on His Majesty’s said lands, murdered some of his subjects,” &c. The act then proceeds to make provision for raising a sum of money to enable the Colony to afford defence and protection. 6 Hen. St. 417. In February 1759, (7 Hen. St. 282,) some of the provisions of this act are again continued by another act then passed.
The King’s proclamation of 1763, (7 Hen. St. 663,) much relied upon by Mr. Vinton, was obviously designed for the preservation of peace with the friendly Indians, and their enjoyment of their hunting grounds, and their occupancy of the lands within their settlements; and to prevent encroachments of the whites upon the Indian occupancy. No intention of the King can be construed in that proclamation to dismember or contract the limits of Virginia. Nor upon any doctrines of English or Colonial law, could that proclamation of the Crown have the effect to obliterate the previous legislation of the Colonial government, or to cancel rights previously vested under its laws.
*778 It was not until the treaty of Paj'is in 1763, that the chartered limits of Virginia, westwardly to the South Sea, were by any public act diminished. That treaty, ^11 fixing the Mississippi as the boundary of the British possessions in the west, of course established that as the limit of the Colony of Virginia. But it was still Virginia, geographically and politically, that by her charter filled up and occupied the British territorial dimensions to that line. During the whole Colonial government of America, after that treaty, there was no title, no claim, so far as is shewn in this case, or can be shewn from the history of the country, interposing between Virginia and the Mississippi. Her title, at least to that extent, was always asserted by her, and maintained in her public acts; some of which have been adverted to. That title for aught that appears was universally recognized, after the peace with France.
After the disturbances between Great Britain and her Colonies had commenced, but before the revolution, Virginia, still maintaining her chartered limits and protecting the frontiers of her settlements within those limits, in July 1775, passed an act, (9 Hen. Stat. 13,) which, among other matters, enacted “ for the better protection and defence of the inhabitants on the frontiers of this Colony,” that two companies should be •raised, a portion of which should be stationed at Pitts-burg, another portion should be stationed at Fort Fin-castle, at the mouth of Wheeling, and another portion stationed at Point Pleasant, at the mouth of the Great Kanawha.
With a title and an occupancy of the western territory, thus demonstrated and maintained by the public acts of Virginia, during a period of more than a century and a half, the convention of Virginia was sustained by the clearest principles of the law of nations, when, on the 29th of June 1776, before the declaration of independence, and before the articles of confederation, the *779 western limit of Virginia, as fixed by the treaty between Great Britain and France, was asserted and established by them in the Constitution then framed, as the fundamental law of the people and all the departments of the government.
After the declaration of independence, Virginia still continued to assert and exercise dominion upon the Ohio, and to the Mississippi, by a variety of public acts, which need not be more particularly referred to, until that signal act of her sovereignty over the western territories was exercised by her in the cession which she made of them in March 1784, and which was consummated by the acceptance of it by the United States in Congress assembled upon the same day.
Upon these considerations, my judgment entirely concurs with that of the Supreme Court of the United Stales, in Handley's lessee v. Anthony, in regarding the cession which was made by Virginia, as the muniment of title and of boundary between her and the grantees to whom the cession was made. And the title of which that cession was the muniment, was recognized by that Court as originating in the charters which had been granted by the sovereign power of Great Britain to the Colony of Virginia. The judgment of the Court, as before stated, established the low water of the river Ohio as the boundary of the cession. Upon the most attentive consideration I have given to that case, and the reasoning of the illustrious Judge who pronounced the judgment of that most enlightened Court, I have not been able to discover any ground upon which I can entertain any dissent, or feel any dissatisfaction with the decision: and consequently, I cannot accede to the pretension of the counsel, contending in this case, on the one side, that the Jilum aqua. is the boundary of the territory and jurisdiction of Virginia: nor on the other side, that that boundary is to be fixed on the northwest bank of the river Ohio.
*780 It remains to consider the second position taken by the counsel for the Commonwealth, that the jurisdicof Virginia extends at least over the entire body of .... . water constituting the river at any given time.
The subject of controversy, in. the case in the Supreme Court, was land ; and it depended upon the boundary separating the lands of one State from those of the other. Land is permanent, and so must be the limits by which it is bounded. As was said by the Chief Justice, “ the same tract of land cannot sometimes be in Kentucky and sometimes in Indiana, according to the rise and fall in the river. It must always be in the one State or the other.” Regarding not the banks, but the river, according to the terms of the cession, as the boundary, it was held, that it was “ the great river,”—■“ the main river;”—“not a narrow bayou, into which its waters occasionally run:” it was “the permanent river;” for otherwise, the territorial limit would not be permanent. The high water, or the usual water mark might be ascertained, and might, it is true, be permanent. But the establishment of either of these as boundaries was considered as repelled by the fair and reasonable construction of the cession, according to the convenience of the parties, and intention of Virginia when she made the cession. For it would happen upon every reflux of the water of the river below these lines, there would be interposed between the river and the main land a slip of shore, which it would be extremely inconvenient to regard as detached from the territorial domain of Indiana; or to be attached to the domain of Kentucky on the other side of the river: and such inconvenience could not reasonably have been intended to be produced by Virginia when the cession was made. The only line which could avoid these inconveniences, and be consistent with the reasonable construction of the cession, was the low water mark, which would always be permanent. And, as the Chief Justice remarked, “ the mind would *781 find itself embarrassed with insurmountable difficulty in . , . ,, . , attempting to draw any other line than the low water mark.” This remark is made when the Chief Justice is speaking of the inconvenience of extending the dominion of a State, even when it retains its dominion over the river, over the land which is left bare by the receding of the water. Taken in its proper context, the meaning of the remark seems to be, that no matter that the domain of the river may have been retained, and without reference at all to that domain, the low water mark of the river must be regarded as the territorial boundary; that is, the boundary of the lands of Indiana. In this view, the Chief Justice seems obviously to have regarded the dominion of the river as capable of being retained, independent and distinct from the territory—the land—which would be bounded by its low water mark. This separation of the dominion of the river from territorial dominion is also clearly manifested where he says, that “ when, as in this case, one State is the original proprietor, and grants the territory on one side only, it retains the river within its own domain,” &c.
In regard to civil rights in rivers appropriated to individuals, we know, that notwithstanding the rale of the municipal law, cujus est solum, ejus est usque ad ccelum, the property in the stream, and in the land covered by the stream, is not inseparable. One individual may acquire property in the stream, whilst another may own the banks and the land covered by the stream. We see also something of the same separation in the division of Admiralty and Common Law jurisdiction. Though the latter has jurisdiction on the shore left bare by the ebb tide, yet the former has jurisdiction over the waters covering the shore at flood. It is said by Vattel, (13. 1, c. 22, $ 266,) that “when a nation takes possession of a country terminated by a river, it is considered as also appropriating the river to itself: for a river is of such great use, that it is to be presumed that the nation in *782 tended to reserve it to itself.” Pvffendorf enumerates . . . . . tlle exceptions to the rule of the law of nations, which divides the sovereignty in the gulfs and channels or arms °f the sea by the middle of the stream, between different nations settled on the opposite banks; and states them to be, “ where one particular people have obtained a dominion over the whole, by pact, or by the tacit concession of the rest, or by the right of conquest, or because they first fixed their station near it, and immediately took it into full possession, exercising acts of sovereignty against the people of the opposite shore : in which latter case, nevertheless, the other neighbouring States, their fellow-borderers, shall be supposed to be lords of each of their particular ports, and of so much of the sea as the convenient access to the shore requires.” It would seem clear, from the doctrine here stated, that the shore, to which convenient access is to be had, must be a part of the domain of the supposed fellow-borderer; and if must be the shore in its fullest breadth, as well that part of it which is adjacent to the sea, as that which is adjacent to the main territory. And it may be remarked, that it tends strongly to sustain Oh. J. Marshall, when he says, that “if instead of an annual and somewhat irregular rising and falling of the river, it was a daily and almost regular ebbing and flowing of the tide, it would not be doubted that a country bounded by the river would extend to low water mark.” Whilst the dominion on the land must be necessarily extended to the low water mark, it is not said that the former dominion of the first proprietor of the sea shall be thereby contracted to that mark. That dominion is still allowed, as retained to him, without any limits, and must continue as before, throughout the whole extent of the sea as it washes the shore at every tide. That dominion is subjected only to the right which the “ fellow-borderer” has to be “ lord of his particular ports, and of so much of the sea as convenient access to the *783 shore requires.” There is no necessity, upon the ground of which the “ fellow-borderer” can claim, that any part of the former dominion in the sea shall be divested out of the first proprietor, and that dominion beyond the low water mark shall become vested in the “fellow-borderer” who has subsequently settled along the shores. Land is stationary, and must have fixed and permanent boundaries : and. should be so established as to allow the riparian proprietor convenient access at all times to the sea. Secured by the law of nations in this territorsal boundary, and in the free enjoyment of the river, why should the dominion before established in another as to the river be curtailed, or be disturbed, except by that necessary servitude of the waters which nature originally, before the formation of States, ordained for the enjoyment of mankind. The dominion with which Virginia was originally vested, and which remains unceded by her, I regard as her dominion still; resting upon sanctions as strong as if she had expressly reserved it in her deed of cession, or had been originally vested with it by compact with a former proprietor. The State of Ohio, however, is not at the mercy of Virginia for the fullest use and enjoyment of the river to supply every want of her people: so that the use and enjoyment of Virginia be not obstructed or injured. Under the cession of Virginia, Ohio has been erected into an independent nation upon the shores of the river. Her rights and privileges as a riparian settler under that cession, are not less strong and secure than if she had, after the settlement of Virginia on the opposite shore, settled herself upon the territory as vacant, which she now holds. In either case she holds the shore as her territory; and although Virginia, according to the law of nations, and according to the decision in Handley's lessee v. Anthony, as I understand the opinion of Chief Justice Marshall, still retains the dominion in the river, the State of Ohio, and her citizens, upon principles irrespec *784 tive and independent of boundary lines, are entitled, in the fullest measure, to the innocent use and enjoyment of the waters of the river. The law of nations enti^es them to the navigation of the river upon which they are borderers; and the Constitution and laws of the United States assure them the rights of navigation in this in common with all other navigable streams within the United States. Besides the rights of navigation in the river, the law of nations declares them to be “ lords of their particular ports, and so much of the river as convenient access to her shores requires.” The erection of wharves, ánd such like facilities, would seem necessarily included in the privilege thus declared. Nor can it be doubted, that her riparian privileges would extend, under the law of nations, to other erections upon the river, for manufacturing purposes, and the like ; provided no obstruction of the river, or other injury, was thereby caused to the proprietor of the domain.
My opinion, therefore, is, that the second position of the Commonwealth’s counsel has been sustained; that the jurisdiction of Virginia extends over the entire body of water constituting the river at any given time.
It remains to consider how the dominion and jurisdiction of Virginia in the waters constituting the river will affect the decision of the present case. The alleged offence was committed by citizens of Ohio standing upon the shore above low water mark, and consequently upon a part of the territory of that State, and standing in the water of the river, the surrounding domain of Virginia. Had the place where the prisoners were standing been left bare at the time by the refluent water, my opinion would have been, that the Courts of Virginia would have no jurisdiction of the offence. Had it been committed entirely upon the water, {ex. gr. in a boat floating upon the river,) then my opinion would have been, that the offence was committed within the domain, and consequently within the jurisdiction of *785 Virginia. The peculiarity and novelty of this case is, that the jurisdiction of Virginia in respect to the waters of the river, is asserted over persons who, in respect of the land upon which they stood, were exclusively within the jurisdiction of the State of Ohio. In deciding between these conflicting elements of jurisdiction, I have searched in vain for any satisfactory authority to shew how they shall bo reconciled, or to which the preference is due. But upon the most anxious consideration, the judgment to which my mind has been conducted is, that the prisoners under these circumstances are not within the jurisdiction of Virginia. A bar or any other inanimate substance on the northwestern shores of the river, would not, I apprehend, be brought within the domain of Virginia, because submerged, or partly submerged by the waters of the river. I do not distinctly perceive, why a citizen of the State of Ohio, placed in a similar situation, should not stand in the same position, as regards the jurisdiction. It can hardly be contended that a citizen of Ohio, entitled as he is to the use of the waters of the Ohio river, changes his government, and subjects himself to a foreign allegiance, whenever he steps into the stream to unlade a boat lying at the beach. If it is the criminal intent against the peculiar laws of Virginia with which that act is done, that can bring him within her jurisdiction, it does seem to me that a great question of jurisdiction between nations, involving their peace, should be ascertained by their Courts upon grounds clearer and less equivocal than the intention, the quo animo, of the act. The adjustment of such cases would seem to fall more aptly within the province of the respective governments than within the province of the judicial authorities of the respective States. As a judicial question, however, it would seem that there would be less liability to error, and less danger of disturbing the harmony of the two States, in deciding upon a jurisdiction thus equivocal, *786 to adopt the fixed invariable territorial landmarks as a • guide, than the fluctuating, shifting and unsteady course of the stream. Whatever weight such considerations • as these may have in deciding this question, there is another which, it seems to me, ought not to be discarded from the case. The terms of the cession which have before been cited, are, that Virginia conveys “ all right, title and claim, as well of soil as jurisdiction which the said Commonwealth hath to the territory or tract of country,” &c. Now, if the territory eeded embraces the shores to low water mark, all jurisdiction of Virginia over it has been granted in terms so absolute and unqualified as to admit of no exceptions; and would seem wholly to extinguish her jurisdiction in the territory under any circumstances whatsoever. Upon these considerations, I am of opinion that the jurisdiction of Virginia in the present case cannot he sustained; and consequently that the prisoners should be discharged.
Smith, J.
delivered the judgment of the Court.
The majority of the Court is of opinion, and doth decide:
1st. That from the facts found, the offences charged were not committed within the jurisdiction of the Court of Wood county, or of the State of Virginia.
2d. That judgment ought to be rendered in favour of the prisoners.
It is deemed unnecessary to deeide any of the other questions adjourned; and it is not intended by the Court to express or intimate any opinion thereon.
Which is ordered to be certified.
Scott, Baker, Christian, Robertson and M’Comas, dissented.